BLAND AND WOOLFOLK *vs.* NEGRO BEVERLY DOWLING. *June*, 1837.

Slaves in this state cannot enter into valid contracts with their masters, nor can they appear as suitors in our courts of justice, legal or equitable.

The letters of an agent, written to his principal, touching the conduct of a negro, whom the principal, the owner, had agreed to set free, on the payment of a certain sum of money, rejected as inadmissible, being of no more efficacy than unsworn declarations.

If a negro slave, with the permission of his owner, takes up his residence in another state, and afterwards returns to this state, such owner cannot resume his property in him, either for the purpose of servitude within the state, or sale to a citizen of *Maryland*, even although the return of the negro *originally*, was against the owner's consent.

The using, or sale under such circumstances, would be equivalent to a sanction of his return, and an evasion of the act of 1786, ch. 67, prohibiting the importation of slaves.

APPEAL from *Baltimore* city court.

On the 31st of October, 1835, the appellee filed his petition for freedom, setting forth, in general terms, his right thereto, which was denied by the plea of the appellants, and issue thereupon joined.

1st EXCEPTION.—At the trial, the petitioner proved, that some time prior to the 7th of August, 1833, *Sophia Bland*, one of the appellants, being the legal owner of the petitioner as her slave, who had been hired to some person in *Baltimore*, entered into an agreement with the said slave, that he should be set free, on the payment to her of the sum of $200; in and from which period, until he was arrested in October, 1835, as a slave, he went at large and acted as a free man, by keeping an oyster house, and boot-black shop, and otherwise acting as his own master. He further proved, that on the 17th day of August, 1833, he paid to her, in part performance of said agreement, the sum of $100—on the 25th of October, 1834, the further sum of $23—and, on the 1st of June, 1835, the further sum of $50, for which he obtained receipts, expressed to be on account of his freedom. That shortly after the last payment, the petitioner left *Baltimore*, and proceeded to *New York*, where he was a waiter on board

a steamboat, on the *North river*, until the month of October, 1835, when he returned to *Baltimore*, and paid over to *Jonathan Pinkney, Esq.* through whose hands the other payments were made, the sum of $27, the balance of the $200 which he was to pay for his freedom, which sum was tendered by *Mr. Pinkney* to a *Mr. Law*, the agent of *Sophia Bland*, but refused to be received as such balance. That after the payment of said $27 by the petitioner to *Mr. Pinkney*, and the tender of that sum by the latter, as the balance due under said agreement, the petitioner was arrested in *Baltimore* as a runaway slave, and soon thereafter sold to *Austin Woolfolk*, a citizen of this state, resident in *Baltimore*.

The petitioner then prayed the opinion and direction of the court to the jury, that if the jury shall be of opinion, from the testimony, that the petitioner had his owner's consent to go at large, to make up the price he was to pay for his freedom, and actually became a resident of another state under that permission, he cannot be imported into this state as a slave, and is entitled to his freedom; and that his voluntary return into this state, in October last, did not entitle his former owner to claim and hold him as a slave, but that such return, coupled with a resumption of property by his owner, was, in law, an importation of him from another state. Which direction the court (*Brice*, *Ch. J.* and *Nisbet* and *Worthington*, *A. J's*,) gave. The defendants excepted.

2d Exception.—Upon the preceding evidence, by agreement made a part of this exception, the defendants prayed the opinion and direction of the court to the jury, that even if they should believe the facts given in evidence by the petitioner to be true, that they must find a verdict for the defendants.

1st. Because there is no evidence that said *Sophia Bland* ever gave her assent to the petitioner to depart from the state of *Maryland*.

2d. Because there is no evidence that she ever gave her consent to the petitioner to reside out of the state of *Maryland*, and to reside elsewhere.

3d. Because there is no evidence from which such assent can be inferred.

4th. Because under the evidence the petitioner became a runaway slave, by leaving the state of *Maryland*, without the permission of his mistress, and that being a runaway slave, she had a right to have him apprehended, and to bring him back to, and sell him in the state of *Maryland*.

5th. Because a slave cannot acquire a residence without the consent of his owner, and because there is no evidence to show that the petitioner ever acquired a residence out of the state of *Maryland*, with the consent of his mistress.

6th. Because the return of the petitioner to the state of *Maryland*, was not an importation into this state by his mistress, contrary to the provisions of the acts of assembly in such cases made and provided.

The court refused the above, and instructed the jury as follows: " That if they should be of opinion from the nature of the agreement between the mistress and the petitioners, and the other testimony in the cause, that she consented to his going at large, and acting as a free man, to earn what he was to pay as the price of his freedom, and that she did not restrict him as to the place of his operations, but left that to his own discretion, she is bound by the use he made of that discretion in going to *New York*, or any other place, where he could soonest accomplish the object in view, the fulfilment of his agreement; and therefore may be said, to have consented to his emigration to *New York*, as it was for her benefit, as well as his. And further, that if the jury shall be of opinion, that under the construction of said agreement, her consent was given to his emigration as aforesaid, she could not claim him again, on his return, as a slave, either for sale, or to reside in this state; and, that if the above facts are found by the jury, the petitioner could not be afterwards treated as a runaway, unless, in the interval, his mistress had regained possession of him, and he had left her service without her consent, and against her will." The defendants excepted.

3d EXCEPTION.—In addition to the evidence on the first bill of exceptions, the defendant proved to the jury by *James O. Law*, that in the years 1833 and 1834, he was the agent of *Sophia Bland*, in the management and superintendence of her negroes in the city of *Baltimore*, and that in the course of his agency he wrote to her three letters, bearing date the 26th October, 1833, 23d December, 1833, and 7th June, 1834, upon the subject; in some of which complaints are expressed with regard to the conduct of the petitioner. The counsel for the petitioner objected to the admissibility of the letters, and the court having rejected them, the defendants excepted.

4th EXCEPTION.—The defendants then gave in evidence by the said *Law*, that he had been the agent for *Sophia Bland* for seven years, and received the wages of her negroes hired in *Baltimore*. That after the contract or agreement made by his mistress to set the petitioner free, on payment of $200, as before stated by him, he did not receive any more wages from him. He disapproved of the petitioner's keeping shop. That the petitioner afterwards, as he learnt from several persons, entered on board a steamboat plying between *Baltimore* and *Frenchtown*, and he frequently inquired for him without effect. He wanted to see him about this agreement he had made with his mistress, and to get what was due her. When the petitioner paid the $23 on the 25th of October, 1834, witness told him, he thought his mistress was not satisfied with his conduct, and would not ratify the contract she had made to set him free, and he offered to pay witness interest for the delay of payment, but it was refused till witness heard from *Miss Bland*, whether she would consent to execute the agreement, as the petitioner had not complied on his part to pay $100 in hand, and the same amount in six months thereafter. That his mistress never required that he should be arrested as a runaway, nor did the witness ever inquire after him, to have him arrested. That the petitioner, when he had got money in the hands of *Mr. Pinkney*, always called and told witness of it.

That said petitioner never had the consent of the witness, nor does he know that he had the consent of his mistress, to leave the state of *Maryland.*

The defendants further proved by *Isaac Mayo,* that on the 15th June, 1834, the defendant, *Sophia Bland,* gave him an authority in writing to act as he thought proper in regard to the petitioner, which he, the witness gave to a constable in *Baltimore,* with instructions to arrest petitioner, inquire what price could be had for him, and inform the witness of it. They then proved by the constable, that in execution of these orders he went in seach of the petitioner, whom he had known as a boot-black in *Baltimore,* but was informed he had gone to *Washington,* and said witness was never after able to find him. They also proved by another witness, that he was well acquainted with the petitioner, and *Sophia Bland,* the defendant, that the former absented himself from *Baltimore,* after the agreement to purchase his freedom, and that his mistress repeatedly inquired for him, and requested witness to inquire for him, which he did, without success.

The petitioner then proved by a competent witness that prior to the agreement before mentioned, he had for several years hired the petitioner as a servant, and on one occasion had leave from *Mr. Law,* the agent of *S. Bland,* to carry him out of the state to *New York,* as a servant, and that after the agreement, the petitioner was frequently out of town, but on his return always called to see the witness and his family.

He also proved by *Jonathan Pinkney,* that the first time he heard of the agreement with the petitioner to purchase his freedom, was from his mistress, one of the defendants, on the 1st day of June, 1835, when he the witness paid her the $50, on account of said agreement, and in part thereof. He never heard said defendant say the petitioner had gone away without her consent, or that she considered said petitioner to be a runaway, nor did he ever hear it from any one else.

The defendants then, upon the whole evidence, prayed the court to instruct the jury, that the petitioner was not entitled to a verdict, and that their finding must be for the defendants.

The court refused to give the instruction, and the defendants excepted.

The verdict and judgment being for the petitioner, the defendants prosecuted the present appeal.

The cause came on to be argued before BUCHANAN, Ch. J. and STEPHEN, ARCHER, and CHAMBERS, Judges.

J. SCOTT and MAYER, for the appellants, contended:

1. That a contract between master and slave, has no validity either at law, or in equity. To constitute a good contract the parties must be free agents, but as the will of master is the will of the slave, the necessary independence, and freedom to make the contract, or not, does not exist. It is no answer to say, that the slave is competent to contract with the consent of his owner, with a third person, because such third person has no control over the slave, who for the purposes of the contract may be regarded as the agent of the master.

Manumission can only be effected by deed, or by last will and testament.

2. It is not denied, that if the petitioner had gone out of the state with the consent of his owner, and had returned voluntarily or compulsorily, and upon such return had been taken up by her, it would have been an importation under the act of assembly, but there is no proof whatever of such assent, and as such conduct would have resulted in a forfeiture of her property the presumptions are all the other way.

Looking to the consequences of assent, the court should require express proof, and not leave it to the jury upon slight or inconclusive circumstances. It has been decided that, a slave is not to be presumed to go at large with the consent of his owner, and the same principle would exclude the presumption that the owner of this slave consented to his going to *New York.*

3. The letters of the agent offered in the 3d exception were admissible. If the answers of the principal were re-

quired, they should have been called for by the other side, but at all events, the non-production of them should have been presented as the ground upon which the admissibility of those offered was resisted. Had that been done her answers might have been produced.

These letters of the agent were the best evidence of their contents, and parol evidence of their contents could not have been given. If that had been attempted, the letters themselves would have been demanded.

R. Johnson and Walsh, for the appellee.

The petitioner from August, 1833, to October, 1835, was permitted to go at large, and to act in all respects as a free man ; and the question therefore is, whether the court was not right in putting it to the jury to say, whether his going to *New York,* was not with the consent of his owner, and this depends not simply upon the fact stated in the exception, but the inferences fairly deducible from them. There certainly is no evidence of dissent, nor should such dissent be presumed, because to go at large in this state would be unlawful, and subject the owner to a penalty. *Burke vs. Negro Joe,* 6 *Gill and John.* 143. The presumption then is, that she intended he should leave the state, as that would be lawful, and not remain here, which would be unlawful.

The second inquiry upon this exception is, whether the return of the petitioner to *Maryland* is not within the meaning of the act of 1796, ch. 67. The object of that law was to prevent the augmentation of our slave population, and a construction must be given it, which will best accomplish that object. The going out of the state mentioned in the first section, not only refers to those who go out permanently, but to those who go to reside at all. There can be no doubt that, if the petitioner in this case had been sent back by his mistress, he would be entitled to his freedom, and the purpose of the law being, to prevent the *return* of such persons as *slaves,* his returning voluntarily can make no difference if after such return the owner resumes his property in him. It

may moreover be fairly inferred from the nature of the contract, that he was authorized both to go and return. He was authorized to go to earn the money which he was to pay for his freedom, and to return, that he might make the payment.

Upon this exception they referred to acts of 1796, ch. 67—1797, ch. 15—1794, ch. 66—1832, ch. 40—1833, ch. 67. *Sprigg vs. Negro Mary,* 3 *Har. and John.* 491, 493. *Baptiste vs. De Volunbrun,* 5 *Ib.* 99. 4 *Bac. Abr.* (statute) 649. Act 1783, ch. 23—June session, 1752, ch. 1—Nov. 1790, ch. 9—1791, ch. 57. The evidence at all events *tended* to prove the assent of the mistress to his going, and his subsequent return, and if it had that tendency it was proper to leave it to the jury. *Davis, et al vs. Barney,* 2 *Gill and John.* 403.

2. But the petitioner is entitled to his freedom upon the contract disclosed in the record. There is nothing in the various acts of assembly upon the subject which forbid the master from contracting with his slave. The slave may contract with a third person with the consent of his owner, and there can be no good reason why he may not contract with him, himself, as then his consent will be implied. The act of 1832, ch. 296, sec. 4, recognizes the power of the slave to contract with the assent of his owner.

It is said on the other side, that every contract of manumission is void, unless the terms of the law are complied with; but this notion is incompatible with the many laws curing the defective execution of deeds of manumission. If such deeds are *void* because of those defects, the legislature could not make them valid, and thus deprive the owner of his property. These laws have been passed, not to make but to carry into effect contracts defectively executed, and proceed upon the principle that the slave is competent to contract. Upon this point they cited. *Hall vs. Mullin,* 5 *Har. and John.* 193. The acts of 1715, ch. 44, sec. 11—1832, ch. 296, sec. 4—1831, ch. 281, sec. 5.

3. The letters of the agent, *Mr. Law,* to his principal, were clearly inadmissible. It does not appear in the first place

that, they were received by her, and if they were, they constitute but parts of a correspondence, and should not be separated from the whole, but the entire correspondence should have gone to the jury.

Those letters furthermore, are the mere verbal unsworn declarations of the agent, and as such could not be evidence against the petitioner, when the very party who wrote them was upon the stand, giving evidence upon oath, upon the same subject.

ARCHER, Judge, delivered the opinion of the court.

Looking at the state of slavery as it exists in this state, and the relations between the slave and his master growing out of such condition, we cannot maintain the principle that a slave can enter into any binding contract with his master, or that he could appear as a suiter in any of our courts of justice, legal or equitable, to enforce any alleged contract. The acts of assembly cited by the counsel for the petitioner do not, we think, give any countenance to the idea. It is apparent from the act of 1715, ch. 44, sec. 11, that anterior to the passage of that law, slaves had been encouraged by traders to purloin the goods of their masters and others, by receiving from them such goods, and turning such trade to their advantage.

It was to strike at this evil the law was passed. It did not recognize certainly any right existing in slaves to deal or barter, for the penalty inflicted on the trader shows directly the reverse, and concedes that the trade, barter, and commerce, was of goods that had been purloined, or conveyed away from some rightful owner other than the slave, there being in case of conviction a forfeiture of the goods to the true owner. The leave or license spoken of in this section, if it apply to slaves, gives to them no power to contract, but merely furnishes an exemption from punishment in the specified case; and might perhaps be considered a relinquishment to the receiver of the rights of the master in the goods so conveyed away, and constituted a very proper exception

from the general provisions of the section—such a case not constituting one of the mischiefs intended, or requiring remedy.

The petitioner in this branch of the inquiry, can derive no support from the act of 1832, ch. 296, for although the word "agreement" is used, it is followed by expressions which we think indicate the sense of the legislature, that they did not mean to use the term contract, in its technical and legal sense. Else why should they have required a manumission, if the agreement had been treated by them as valid, and binding, and as giving freedom? Why should they not have given the same fruits as they would, when followed out by a manumission? Looking at the whole section together, we think the term "*understanding*" was used to qualify the term "*agreement*," or rather to show the meaning which they desired to be attached to that term.

The next question arising under the first bill of exceptions is, whether any evidence exists which should have enabled the court to put the question to the jury, whether the mistress had consented that, the petitioner should reside out of the state.

The agreement to set the petitioner free upon the payment of two hundred dollars is proved; and it is proved that from the 7th of August, 1833, till October, 1835, *upwards of two years he went at large* and acted *as a free man.* We think too, that the receipts furnish evidence that she knew he was going at large up, at all events, to the 1st day of June, 1835, when she signed the last receipt "*on account.*"

Here then is evidence of an agreement to set him free, and here is evidence of a knowledge of the servant's going at large, and acting as a free man, which conduct on the part of the petitioner commences at the very time of the agreement.

Now supposing this agreement to be entered into, and this knowledge to exist, may not the jury legally draw the inference, that this going at large, and acting as a free man, was permitted to enable the petitioner to pay the money he

had agreed to pay? And do not the receipts furnish evidence of her sanctioning during a long period this procedure on the part of the petitioner? There is clearly evidence both of knowledge on this subject, and of acquiescence—and if he should be found to have entered into this agreement—to pay a sum of money for his freedom, and to act as a free man; if in the exercise of this permission he should go abroad into another state, with views of more easily fulfilling his agreement, it is but the exercise of that discretion which every free man has; and which, as it is not limited by any just inference from the testimony, the mistress must take the consequence of the exercise of such discretion. And the jury would be at liberty to infer from the facts a permission to go whithersoever he pleased, so that by so doing, he could the more readily and easily accomplish the fulfilment of the agreement.

We therefore concur with the court in the first exception.

These views lead to the decision of the second bill of exceptions in favour of the opinion of the court below.

The third bill of exceptions presents a question on the admissibility of evidence. The purpose for which the letters were offered is not stated, but we presume they were intended to shew, that either the agent in the line of his duty to his principal had been dissatisfied with the petitioner's going at large, or that his course as indicated by these letters was such as had been dictated by the mistress. These letters are not proven to have been received by her, nor are they shown to have been in her possession, but the bill of exceptions would leave us to infer that they were presented in court by the witness himself.

If offered for either of the above purposes, they were capable of proof by the witness, and should have been testified to by him. As the letters are produced they have no greater efficacy than unsworn declarations, and we think were properly rejected by the court.

The fourth bill of exceptions, although other evidence is incorporated in it, offered by the defendants, does not pre-

sent the question in any light more favourable to them. Whatever dissatisfaction appears to be expressed in relation to the petitioner's course, seems to spring from his failure to comply with his contract; and even after the defendant is informed that the petitioner had gone to Washington. And a year after authority is given to an agent to do what he may think proper as to the petitioner, the defendant received from Mr. Pinkney fifty dollars on account, according to her receipt, and according to Mr. Pinkney's evidence, on account of said agreement, and in part thereof, thereby still recognizing the agreement as an existing one, and speaking to him at the time of the payment of having entered into such an agreement with the petitioner. We therefore concur with the court below in the fourth bill of exceptions.

On the subject of a resumption of the rights of property over the petitioner after his return, and his seizure and sale amounting to an importation within the meaning of the act of 1796, ch. 67, a question involved both in the first, and fourth prayers we have made no comments, because the question was yielded by one of the counsel of the defendants. It certainly could not be successfully contended that, if a residence in another state was granted by permission of the owner, that rights of property could be resumed on his coming within the limits of the state, and that for the purposes of servitude within the state, or for sale to a citizen of Maryland. Even although the return had been *originally* against the consent of the owner, for by such using, or sale to a citizen his return was sanctioned, and if such a course of proceeding do not amount in law to an importation within the meaning of the act, its provisions would be liable to great evasion.

JUDGMENT AFFIRMED.